In re John D. CONNAGHAN,
Respondent.

No. 61519.

Supreme Court of Missouri,
En Banc.

March 9, 1981.

Martin J. Toft and Jay A. Summerville, St. Louis, for informants.

Edward R. Joyce, St. Louis, for respondent.

FINCH, Senior Judge.

This is a disciplinary proceeding against John D. Connaghan, respondent, brought under Rule 5 by the Bar Committee of the 22nd Judicial Circuit of Missouri.

After notice and hearing as required by Rule 5, the Circuit Bar Committee found that there was probable cause to believe that respondent Connaghan had engaged in conduct which is subject to discipline. It then filed in this court an information which charged that respondent had collected a fee of $20,000 from various automobile dealers to help them secure favorable action on legislation which was then pending in the Missouri legislature. The information alleged that respondent performed no legal services but instead transferred a substantial portion of the money to Richard J. Rabbitt, Speaker of the House of Representatives, to secure favorable treatment of the legislation. Such conduct was alleged to violate the laws of the State of Missouri and of the United States of America and to constitute violations of Missouri Supreme Court Disciplinary Rules DR 1–102(A)(1), (3), (4) and (6); DR 2–106(A), DR 2–107(A)(2), DR 7–102(A)(7) and (8), and DR 9–101(C). The information asked the court to hear evidence on the charges and to find respondent guilty of such charges. Disbarment was requested.

The court, acting under Rule 68.03, appointed Honorable E. Richard Webber as special master to hear evidence and make findings of fact and conclusions of law. He held a hearing at which informants offered several witnesses, including the respondent. When the latter declined to answer questions on the ground that his answers might incriminate him, informants offered in evidence a transcript of testimony given by respondent in the United States District Court for the Eastern District of Missouri in the case of *United States of America v. Richard J. Rabbitt.* Respondent offered no evidence other than character witnesses.

After the matter was briefed and argued, the special master filed a 27–page report containing findings of fact, conclusions of law and a recommendation. He found that the preponderance of the evidence disclosed that respondent had engaged in conduct which violated all of the Disciplinary Rules recited in the information except DR 9–101(C). He recommended that respondent be disbarred.

In disciplinary proceedings the findings and conclusions of a special master are advisory for the court but in the final analysis it is our duty to determine the credibility of witnesses, to review the evidence, and to make our own determination of the facts. *In re Schiff*, 542 S.W.2d 771 (Mo.banc 1976); *In the Matter of Pine*, 576 S.W.2d 538 (Mo.banc 1979). In making such determination the charges must be sustained by a preponderance of the evidence before discipline may be imposed. *In the Matter of Duncan*, 541 S.W.2d 564 (Mo.banc 1976).

Applying the foregoing standards, the credible evidence supports a finding of these facts.

For two or three legislative sessions prior to the January, 1973 session of the Missouri General Assembly, the Greater St. Louis Automobile Dealers Association (and others, including the state association) had sought enactment of legislation to repeal the then existing merchants' tax as it applied to automobile dealers and to substitute a different formula for taxation. The automobile dealers considered the existing merchants' tax to be very unfair and discriminatory as to them.

Such efforts had not been successful and in the January, 1973 session, a new bill, Senate Bill No. 110, was introduced for this purpose. It was passed by the Senate and sent to the House of Representatives.

In early May, when the bill was pending before a committee of the House of Representatives, the St. Louis Association received a report from the state association in Jefferson City that the bill was not moving. It was requested that Gene Worn, a legislative liaison for the St. Louis Association, be sent to Jefferson City to try and help expedite passage of the bill.

Mr. Worn went to Jefferson City and visited the offices of Richard J. Rabbitt, the Speaker of the House of Representatives. Worn subsequently reported to his superior, Edgar Hayward, that when he asked Speaker Rabbitt what could be done to expedite the bill, Mr. Rabbitt suggested that the association needed additional legal counsel and recommended respondent John D. Connaghan.

At the direction of Mr. Hayward, Worn met respondent and discussed Senate Bill No. 110 with him. Worn advised that he was there at the suggestion of Speaker Rabbitt. There was discussion about a fee and respondent advised that his fee would be $20,000. Worn then reported his conversation to Mr. Hayward.

On the next morning, which was Saturday, May 12, 1973, Hayward and Worn met with Ben Lindenbusch and Vincent McMahon, two St. Louis automobile dealers. They were told of the meetings with Speaker Rabbitt and with respondent Connaghan. Worn recommended that the fee of $20,000 be paid to Connaghan in order to move the bill and get it passed.

A decision was made to pay the fee and Connaghan was so notified. Worn immediately took Connaghan a check of Ben Lindenbusch dated May 14, 1973, payable to Connaghan for $5,000 and advised that the rest would be paid soon. On June 4, 1973, checks to Connaghan for $5,000 each from Charles Johnson and Gene Jantsen, both St. Louis automobile dealers, and from the Motor Car Dealers Association of Greater Kansas City were delivered to Connaghan. Connaghan deposited all four checks in his bank account.

After Worn made the arrangements with Connaghan, the latter had a conversation with Peter Rabbitt, brother and law partner of Richard J. Rabbitt, in which he indicated that he was receiving $20,000 from the automobile dealers, that he was reporting this as income for tax purposes, that he estimated his tax thereon would be about

one third of the $20,000, that he intended to keep one third for that purpose, and that he would pay the rest to the Rabbitts.

Connaghan testified in the Rabbitt trial that on separate occasions he delivered $5,000 in cash to Richard J. Rabbitt and checks for $2,000 and $6,800 to Peter Rabbitt. The check stub for the $2,000 check bore the notation that it was a referral fee in the case of *England v. Pope*, a case handled by Connaghan. Actually Rabbitt had not referred that case and did no work on it. Peter Rabbitt deposited this check in the account of Rabbitt, Rabbitt and Dickerson, the law firm in which both Richard J. and Peter were partners. The check for $6,800 was marked as a personal loan but it was not treated as such by Connaghan. No note was given and there was no discussion about interest or terms of repayment. This check was deposited by Peter Rabbitt in an account designated as the Richard J. Rabbitt special account.

Connaghan also identified a slip of paper which, after listing the foregoing three payments of $5,000, $2,000 and $6,800 also listed an additional cash payment of $500. This was in Connaghan's handwriting but he did not remember making that payment and there was no other evidence about it. Thus the amount paid by Connaghan to Richard J. and Peter Rabbitt out of the $20,000 was either $13,800 or $14,300, depending on whether the $500 item is counted.

Several months later Connaghan became concerned that his taxes on the $20,000 would be greater than the amount he had retained out of the $20,000. He devised a scheme of remitting to Peter Rabbitt a part of his attorney fees on various other cases he had settled that year and then taking a deduction therefor on his tax returns. He told Peter Rabbitt that he would figure an amount on various cases and give him a check therefor, after which Rabbitt would give back a check for that identical amount, marking it as a partial repayment of a loan for $6,800. Connaghan made his computations, listing various cases, and then wrote a check to Peter Rabbitt for $4,345.87 which

he delivered. Actually neither Peter nor Richard Rabbitt had referred any of the clients in those cases to Connaghan and they had performed no services in those cases. This was simply a scheme to save taxes for Connaghan.

After receiving the check for $4,345.87 from Connaghan, Peter Rabbitt wrote and delivered a check for that same sum to Connaghan, marking it as a payment on a loan although there was no loan from Connaghan to Peter Rabbitt.

Three questions are presented for determination. First, was the transcript of respondent's testimony in the trial of Richard J. Rabbitt admissible in evidence in this disciplinary proceeding? Second, does a preponderance of the evidence support a conclusion that respondent violated all or any of the disciplinary rules alleged in the information to have been violated? Finally, if respondent did violate disciplinary rules, what discipline should be imposed?

## I

*Was the transcript of respondent's testimony in the trial of Richard J. Rabbitt properly admitted in evidence by the special master?*

As previously noted, the informants called respondent as a witness in the presentation of their evidence before the special master. After being sworn he gave his name and address but declined to answer all other questions, including questions about his dealings with Worn, receipt of the $20,000, payments to Rabbitt, etc., on the grounds that his answers might incriminate him, citing the Fifth Amendment to the United States Constitution and Art. I, § 19 of the Missouri Constitution.

Informants then offered in evidence a transcript of the testimony Connaghan had given in the trial of Richard J. Rabbitt in the United States District Court. That testimony was given under order of the United States District Court dated January 19, 1977, issued on application of the United States pursuant to Title 18, United States Code, Sections 6002 and 6003, after Conna-

ghan had refused to answer questions on the basis of his privilege against self-incrimination. The order instructed Connaghan that he could no longer refuse to testify on the basis of his privilege and that when he should comply with the order and testify, "none of his testimony or other information so compelled by this Order or any information directly or indirectly derived from such testimony or other information may be used against the witness, JOHN D. CONNAGHAN, in any criminal case, except a prosecution for perjury, giving a false statement, or otherwise failing to comply with the Court's Order."

The special master concluded that testimony of Connaghan given in the *Rabbitt* prosecution in federal court was admissible. We agree. No Missouri case has resolved this question but cases from other jurisdictions support this conclusion.

In the case of *In re Daley*, 549 F.2d 469 (7th Cir. 1977), *cert. denied*, 434 U.S. 829, 98 S.Ct. 110, 54 L.Ed.2d 89 (1977), Daley, an attorney, was subpoenaed to appear and testify before a federal grand jury. He advised the United States Attorney of his intention to assert his Fifth Amendment privilege against self-incrimination if called to testify. The United States Attorney then obtained an order immunizing Daley from use of his testimony (or information derived therefrom) in any criminal case, except perjury, giving a false statement or failing to comply with the order. In addition, the district court order recited that no testimony of Daley compelled by said order would be usable in any professional disciplinary or disbarment proceeding. Daley testified, pursuant to this order, in an extortion prosecution of one Bonk. He told of transferring several thousands of dollars in bribes to Bonk to secure favorable zoning variances for Daley's clients.

Thereafter, the Illinois Attorney Registration and Disciplinary Commission instituted a proceeding to determine whether discipline of Daley was warranted. The Commission denied Daley's motion to exclude his testimony given in the Bonk case under compulsion of the grant of immunity.

Daley then filed a motion in the United States District Court which entered the immunity order, asking that the Disciplinary Commission be compelled to comply with the provisions of the order which barred use of the testimony in any disciplinary proceeding. The district judge sustained that motion.

On appeal, the court of appeals reversed, holding that the testimony given pursuant to the grant of immunity could be used in the disciplinary proceedings against Daley. The court held that the federal statute, phrased in the language of the Fifth Amendment, immunizes the witness against use of his compelled testimony in any criminal case, federal or state, but not in disciplinary proceedings involving the right to continue to practice law. Such proceedings are not criminal in nature and are not to inflict punishment on the attorney. Rather, their purpose is to determine fitness to continue in the capacity of an attorney and to protect the public. Therefore, neither on the basis of the language of the immunity statute nor on constitutional grounds is the witness afforded protection against use of his testimony in disbarment proceedings. This was true, the court ruled, even though the district court's order in *Daley* specifically prohibited use of such testimony in any subsequent disciplinary proceeding. In so directing, the appellate court ruled, the district court exceeded its authority under the immunity statute. Likewise, the United States Attorney, in seeking to so extend the immunity to disciplinary proceedings, acted beyond the scope of his authority. The court reviewed numerous cases, both state and federal, and concluded that all of them are consistent with the result reached by them in *Daley*.

In *Segretti v. State Bar*, 15 Cal.3d 878, 126 Cal.Rptr. 793, 544 P.2d 929 (Cal.1976), the Disciplinary Board of the State Bar of California instituted proceedings which sought to have Segretti disciplined for various acts done on behalf of the reelection of President Nixon. In upholding a suspension of Segretti for a period of years, the court addressed his contention that his priv-

ilege against self-incrimination was violated by use in the disciplinary proceedings of transcripts of his testimony given before the United States Senate's Select Committee on Presidential Campaign Activities and in the trial of a criminal case against Dwight Chapin. Such testimony had been given pursuant to a court order directing him to testify and granting him immunity as provided in 18 United States Code, Section 6002. Citing and discussing numerous cases, the Supreme Court of California held, 544 P.2d at 933, that "[t]he purpose of disciplinary proceedings against attorneys is not to punish but rather to protect the court and public from the official ministrations of persons unfit to practice. (authorities omitted). Such a proceeding is not a criminal case for purposes of the Fifth Amendment privilege against self-incrimination. (authorities omitted). Thus that privilege was not violated by the use at the instant proceedings of testimony given by Segretti under grants of immunity. (authorities omitted)."

Other recent cases reaching the same conclusion include *Anonymous Attys. v. Bar Ass'n of Erie Cty.*, 41 N.Y.2d 506, 393 N.Y. S.2d 961, 362 N.E.2d 592 (N.Y.1977); *Maryland State Bar Association, Inc. v. Sugarman*, 273 Md. 306, 329 A.2d 1 (1974), *cert. denied*, 420 U.S. 974, 95 S.Ct. 1397, 43 L.Ed.2d 645; *Committee on Legal Ethics of W. Va. St. Bar v. Graziani*, 157 W.Va. 167, 200 S.E.2d 353 (1973).

In oral argument, counsel for respondent acknowledged that all decided cases are in accord. He argued, however, that the rule should be different, relying on reasoning in dissenting opinions in *Kastigar v. United States*, 406 U.S. 441, 92 S.Ct. 1653, 32 L.Ed.2d 212 (1972) and *Spevack v. Klein*, 385 U.S. 511, 87 S.Ct. 625, 17 L.Ed.2d 574 (1967). We are not persuaded. We find the reasoning and result in *Daley, Segretti, Anonymous Attorneys, Sugarman, Graziani* and the cases on which they rely to be convincing.

Art. I, § 19 of the Missouri Constitution does not justify a different result. It, too, protects persons against being compelled to testify against themselves in criminal cases. It does not prevent use in this disbarment proceeding of respondent's testimony in the *Rabbitt* trial.

We hold that the transcript of Connaghan's testimony in the *Rabbitt* trial was admissible.

## II

*Does a preponderance of the evidence support a conclusion that respondent violated any of the disciplinary rules which the information charges that he violated?*

We consider separately the various rules involved.

"DR 1–102.   Misconduct

(A) A lawyer shall not:

(1) Violate a Disciplinary Rule.

(3) Engage in illegal conduct involving moral turpitude.

(4) Engage in conduct involving dishonesty, fraud, deceit, or misrepresentation.

(6) Engage in any other conduct that adversely reflects on his fitness to practice law."

■   The evidence clearly supports a finding that respondent engaged in illegal conduct which involves moral turpitude. Following a conference in which he was advised that automobile dealers came to him for help and that Speaker Rabbitt had sent them to him, he accepted $20,000 to help them secure passage of Senate Bill No. 110. He treated that money as income to him but he did no legal work or lobbying therefor. Instead he retained an amount estimated as sufficient to cover his tax liability thereon and then turned the balance over to Speaker Rabbitt or his brother. Most, if not all, of the money paid to Peter Rabbitt went into the account of Speaker Rabbitt. After the money was paid by the automobile dealers, Senate Bill No. 110 was reported out of committee and then passed by the House of Representatives. This evidence supports, in fact compels, the conclusion that this was a plan to obtain passage of legislation by paying money to a lawmaker and that the bill passed as a result of the

payment. This constitutes a flagrant attack on the integrity of the legislative process. It amounts to bribery. It does involve moral turpitude. *In re McNeese*, 346 Mo. 425, 142 S.W.2d 33 (1940).

Respondent argues that at most the evidence shows only that he acted as conduit to get the money from the payors to the legislators and that he, respondent, received nothing out of it. This, he seems to suggest, makes him a nonculpable participant and prevents his conduct from involving moral turpitude. We find no merit or substance in this position. Respondent's conduct was wrongful and illegal and involved moral turpitude, whether he acted only as conduit or bagman, or whether he also received a financial benefit.

In addition, the evidence shows that in conducting the transaction respondent engaged in deceit and misrepresentation in that he handled the money in such a way as to conceal the real purpose of this transaction. He made it appear that the disbursements of $2,000 and $6,800 to Peter Rabbitt were an attorneys fee in another case and a loan to Peter Rabbitt when the facts were otherwise. The cash payment to Richard Rabbitt was concealed by respondent's act in cashing a $5,000 check made to cash and then hand delivering that cash to Speaker Rabbitt. Finally, respondent further sought to misrepresent and deceive by the exchange of checks for $4,345.87 with Peter Rabbitt whereby he sought to decrease his tax liability by making it appear, contrary to actual fact, that this sum was paid to Rabbitt out of fees in other cases and that Rabbitt paid the money back as a return of capital on a $6,800 loan.

Such conduct clearly violates DR 1–102(A)(3) and (4) and since it does, respondent thereby also violated DR 1–102(A)(1).

We do not find that respondent violated DR 1–102(A)(6). Undoubtedly, as the special master found, the conduct of respondent which we have discussed reflects on respondent's fitness to practice law. However, this subsection of DR 1–102(A) refers by its terms to "any other conduct" which reflects adversely on fitness to practice law.

In other words, it seems to contemplate conduct other than that described in the preceding numbered subsections. It is not simply another method of proscribing the same conduct. The informant's brief does not point to "any other conduct" of respondent in discussing DR 1–102(A)(6) and the special master's report does not find separate conduct to support a finding of a violation of DR 1–102(A)(6).

"DR 2–106. Fees for Legal Services

(A) A lawyer shall not enter into an agreement for, charge, or collect an illegal or clearly excessive fee."

Respondent admits that he collected a fee of $20,000 from the automobile dealers. He did not tell them that he was collecting this for Speaker Rabbitt and would pay the money to him. Instead, it was collected as a fee. The stub of the Motor Car Dealers Association of Greater Kansas City was so marked. Actually Connaghan did no legal work or any lobbying for the fee. He testified that he had no intention of performing any services. As previously stated, he paid the money, less the estimated tax, to Speaker Rabbitt. Respondent argues that he was not functioning as a lawyer and did not receive the $20,000 as an attorney fee. Rather, he says, it was passed through him under arrangement made directly between Rabbitt, Worn and Hayward. The evidence does not so show. Instead, the evidence justifies a conclusion that respondent did charge an attorney fee which was illegal in that it was for an illegal purpose, and one which was excessive because no services were performed. We find that respondent did violate DR 2–106(A).

"DR 2–107. Division of Fees among Lawyers

(A) A lawyer shall not divide a fee for legal services with another lawyer who is not a partner in or associate of his law firm or office, unless:

(2) The division is made in proportion to the services performed and responsibility assumed by each."

Neither Peter nor Richard Rabbitt was a partner of respondent and they were not associated in a law firm or law office with respondent. They performed no legal services in this matter. Even so, respondent paid a part of his $20,000 to them. This action violated DR 2–107(A). In addition, in order to reduce his tax liability, respondent made a spurious division of fees in other cases with Peter Rabbitt, although Rabbitt had had no connection with or responsibility in those cases. This, too, violated DR 2–107(A). Again respondent argues he was not representing the automobile dealers as an attorney and the $20,000 was not an attorney fee. We reject that interpretation of the evidence.

"DR 7–102. Representing a Client Within the Bounds of the Law

(A) In his representation of a client a lawyer shall not:

(7) Counsel or assist his client on conduct that the lawyer knows to be illegal or fraudulent.

(8) Knowingly engage in other illegal conduct or conduct contrary to a disciplinary rule."

The evidence shows that respondent accepted the automobile dealers as clients. It is not shown that he counseled the clients to engage in illegal or fraudulent conduct or assisted them in engaging in such conduct. Hence, it is not shown that he violated DR 7–102(A)(7). However, in representing them he did knowingly engage in conduct which as a lawyer he had to know was illegal and fraudulent and violative of disciplinary rules. Such evidence justifies a finding that respondent violated DR 7–102(A)(8).

"DR 9–101. Avoiding Even the Appearance of Impropriety

(C) A lawyer shall not state or imply that he is able to influence improperly or upon irrelevant grounds any tribunal, legislative body, or public official."

The special master found that there was no proof that respondent stated or implied to anyone that he was able to improperly influence any tribunal, legislative body or public official. Informant's brief does not present any facts or argument that this finding by the special master was wrong. Therefore, we find that the evidence does not show that DR 9–101(C) was violated.

### III
### *What Discipline should be imposed?*

Enactment of legislation in response to payments made to a legislator strikes at the very heart of our system of government. Participation in such a plan can properly be described as illegal, dishonest, deceitful, fraudulent, and conduct which involves moral turpitude. It is the antithesis of the conduct properly expected of a lawyer in representing his client and in dealing with a legislator or legislative body. Respondent compounded his wrongful conduct by disguising his transaction so as to mislead and defraud the federal and state tax authorities.

We recognize that respected public officials testified to respondent's prior good reputation as a person and as a lawyer and to his creditable military record. Such evidence must be and is taken into consideration by us. However, on this record we can conclude only that the gravity of the conduct involved is such that we must disbar respondent.

Accordingly, it is the judgment of this court that respondent be disbarred and that his name shall be stricken from the roll of attorneys.

DONNELLY, RENDLEN, SEILER, WELLIVER, MORGAN and HIGGINS, JJ., concur.

BARDGETT, C. J., not sitting.